[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION[1]
The court disagrees with the defendants, Summerville At Litchfield Hills, LLC[2] (Torrington)[3] ans Summerville At South Windsor, LLC (South Windsor), when they claim that "[b]oiled down to its barest elements this case is simply about greed." This case may well be about the exercise of poor business judgment on the part of Summerville Senior Living (SSL)[4] but that poor business judgment cannot be translated into a legal defense. The plaintiff Zanker Group LLC (Zanker) merely seeks to enforce its very favorable and generous contractual rights.
 I Common Units
Zanker, having obtained an option on a site in Torrington for the development of a managed care facility entered into negotiations with SSL. As a result of these negotiations, Zanker and SSL formed in 1997 the limited liability company known as Torrington.
The operating agreements[5] for Torrington provide for 100 Common Units representing ownership in the limited partnership. of the 100 Common Units, seventy-five were issued to SSL and twenty-five were issued to Zanker. of the 25 Common Units issued to Zanker, 16.667 Common Units were subject to forfeiture. The operating agreements provided that if CT Page 11984 Zanker presented in addition to Torrington two or more "Eligible Projects" prior to the deadline of June 1, 2001 (deadline), its 25 Common Units would be fully vested. In the event that Zanker presented one additional "Eligible Project" prior to the deadline, 6.25 Common Units would be forfeited. If no additional "Eligible Projects" were presented prior to the deadline 16.667 Common Units would be forfeited. Zanker and SSL on the same date entered a Development Agreement which specifically defined an "Eligible Project."[6]
One year later, Zanker identified a site for a second project in South Windsor. As a result, Zanker and SSL formed a second limited liability company in 1998 known as South Windsor and they entered into similar operating, development and management agreements as they did with respect to Torrington.
SSL, Torrington and South Windsor concede that there are two Eligible Projects, giving Zanker a vested interest of 18.25 Common Units in both Torrington and South Windsor. The dispute is whether Zanker identified a third Eligible Project[7] within the deadline or whether it was legally excused from doing so.
Zanker claims it did identify a third Eligible Project. The third Eligible Project that Zanker relies upon is Bristol. There is no question and the court finds that Bristol met the criteria necessary to be designated as an Eligible Project. Not only did SSL spend in excess of $50,000 for legal fees and other expenses on Bristol, but it acknowledged in writing that it was an Eligible Project.[8]
SSL argues that the Bristol Zoning Commission on November 12, 1998 denied its application for a facility of 71 units (one more than required for it to be an Eligible Project). This zoning issue was a mere subterfuge. SSL's failure to pursue the zoning approval must be viewed in the context that (1) SSL, prior to the denial of zoning, sought to renegotiate its contract with the Zanker because it was too costly and, (2) that it did not diligently pursue the zoning issues as it did in the case of South Windsor. (SSL's application was initially denied for South Windsor, but a second application was granted.)
Furthermore, it is clear that between the period of September 18, 1998 and October 14, 1998, SSL unequivocally repudiated its agreement with Zanker. SSL made it clear to Zanker that it would not consider other Eligible Projects under the terms of the agreements it had with Zanker, notwithstanding that Zanker had until June 1, 2001 to identify the third project. In a letter dated September 18, 1998, SSL sought to change the terms of the agreement. ("We need to discuss this further and come to an CT Page 11985 agreement on continued development. This would of course, include Bristol, which I mentioned above.") And it was made crystal clear in SSL's letter of October 14, 1998. ("I regret that the capital market is driving us to modify our relationship. Unfortunately, if we are unable to come to new terms with you, we will be unable to do the Bristol project.") This correspondence to Zanker constitutes clear evidence that SSL repudiated its contract. Indeed, in the letter dated September 18, 1998 to Zanker, from Arthur Herombull, Chairman of the Board of SSL, he acknowledges the following: "4. Bristol, Connecticut — I like the site, the location and the prospects for this project. We would like to proceed with it, albeit, under a different development agreement than the first two projects. The reasons I discussed in some detail with you during lunch yesterday." This reason being that its agreement with Zanker was too generous. This constitutes a clear case of repudiation which excused Zanker from identifying a third Eligible Project. See O'Keefe v.Bassett, 132 Conn. 659, 663 (1949). (". . . the failure of the former to perform his obligations entitled the latter to regard the contract as discharged and to put an end to it.").
The basis for the law of repudiation is that no one is required to do a useless act. "Accordingly, when one party to a contract repudiates the contract, or gives notice to the other party before the latter is in default that he or she will not perform, the nonrepudiating party is entitled to enforce the contract without previously performing or offering to perform the provisions of the contract in favor of the repudiating party. The repudiating party, by contrast, cannot demand performance from the nonrepudiating party, and may not sue the nonrepudiating party for nonperformance. [footnotes" 13 Williston on Contracts, 4th ed., § 39:37. The Restatement put it as follows: "Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance." Restatement of Contracts 2d, § 253(2).
The court concludes that Zanker's 25 Common Units are vested and it retains a twenty-five percent interest in Torrington and South Windsor.
 II Placement Distribution
Zanker was paid a placement distribution based on 16.667 Common Units when it should have received that distribution based on 25 Common Units. Accordingly, Zanker is entitled the difference of 8.333. CT Page 11986
 III Payment of Financing Distribution
Torrington and South Windsor argue that, notwithstanding the issue of the number of Common Units owned by the plaintiff, the financing distribution is not due and payable at this time. They argue, that it is not payable at this time since the operating agreement provides that the "[m]anager shall pay the Financing Distribution through an appropriate withdrawal from the funds of the Facility."[9] (emphasis supplied). Both Litchfield and South Windsor facilities have sustained significant losses from their operation. If there are no funds, none can be paid out. Although this does not effect the liability of Torrington and South Windsor to pay these Financing Distributions, they can only be paid "from the funds of the facility."[10] Accordingly, Zankers is not entitled to the payment of Financing Distribution at this time.
 IV Liability for Consultation Fees
The Operating Agreements for each facility incorporates by reference paragraph 4(e) of the Development Agreement between the parties that provides the following: "The Company shall make to Zanker Group a distribution of one (1) percent of the gross revenues of the Company in return for the Zanker Group's provision of ongoing consultation in Conjunction with the [SSL]. Such services shall include professional consultation, marketing, and other clinical and administrative servicesas requested by [SSL]. . ." (emphasis supplied).
Since the facilities were opened, neither SSL or the managers of Torrington or South Windsor have requested any consultation or other services from Zanker. Torrington and South Windsor argue that because the clause has words "as requested by [SSL]" Zanker is only entitled to the consulting fees when those services are requested. The defendant simply tortures these words by inserting them where they are not.
The first sentence of the clause — "a distribution of one (1) percent of the gross revenues of the Company in return for the Zanker Group's provision of ongoing consultation with the [SSL]" — clearly provides that Zanker is to receive the fee whether or not services are requested.
The second sentence in which the clause "as requested" designates the type of consulting services required not that the fee arrangement is CT Page 11987 conditioned upon the request. "[C]ontractual terms are to be given their ordinary meaning and when the intention conveyed is clear and unambiguous, there is no room for construction." Southern New EnglandContracting Co. v. Norwich Roman Catholic Diocesan Corporation,175 Conn. 197, 199 (1978).
To interpret that the liability for the consultation was in the manner that the defendant advocates would simply not make sense. According to the defendant, if there was ten minutes of requested consultation, Zanker would be entitled to one percent of the gross income for the year or even more incredulous — one percent of the gross income for the ten minute period.
Zanker is entitled to a consulting fee wether or not it is requested by SSL, Torrington or South Windsor.
 V Interest
In addition to the foregoing, Zanker is also entitled to recover interest at the rate of ten percent a year on all sums that are due and payable at this time. General Statutes § 37-3a.
 VI
In summary, the court concludes that Zanker has vested 25 Common Units in Torrington and South Windsor, was entitled to payment of the placement distribution based on the 25 Common Units but received it based on 16.667 Common Units, is entitled when funds are available to a financing distribution, is due at this time and for the future consulting fees based on one percent of the gross revenue and is entitled to interest at the rate of ten percent per annum on all sums that are payable at this time.
Robert I. Berdon, Judge Trial Referee